UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KENNETH E. COOPER,

    Plaintiff/Counter-Defendant,

vs.                                                              No. 1: 24-CV-00504-MIS-GJF

CITY OF GALLUP,

    Defendant/Counter-Claimant,

and

CITY OF GALLUP,

    Third-Party Plaintiff,

vs.

REACHING HIGHER SOLUTIONS, LLC,
a/k/a REACHING HIGHER HR SOLUTIONS, LLC,
d/b/a MERCER GROUP ASSOCIATES,

    Third-Party Defendant.

**THIRD-PARTY COMPLAINT**

Third-Party Plaintiff City of Gallup ("Gallup") submits the following Third-Party Complaint against Third-Party Defendant Reaching Higher Solutions, LLC, a/k/a Reaching Higher HR Solutions, LLC, d/b/a Mercer Group Associates ("RHS"):

**Parties, Jurisdiction and Venue**

    1.     Gallup is a home rule municipal corporation situated in McKinley County,

State of New Mexico.

2.  Kenneth E. Cooper ("Cooper") is an individual residing in and a citizen of the State of Arizona. Cooper has sued Gallup for alleged violations of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. [Doc. 16]

3.  RHS is Georgia limited liability company with its principal place of business in Manor, Georgia and/or Athens, Georgia. Upon information and belief, all members of RHS reside in and are citizens of the State of Georgia and/or States other than the State of New Mexico.

4.  Jurisdiction respecting this Third-Party Complaint lies in this Court pursuant to 28 U.S.C. 1367 and 1332.

5.  Venue is appropriate in this Court pursuant to 28 U.S.C. 1391(a), -(b), and related law.

6.  RHS is subject to this Court's personal jurisdiction as the result of its presence in New Mexico and conduct set forth below.

## General Allegations

7.  Cooper was employed by Wal-Mart Stores, Inc. ("Wal-Mart") as the manager of its Silver City, New Mexico store from 1998 to 2005.

8.  In September 2005, the Wal-Mart Ethics Hotline received an anonymous complaint about Cooper. Wal-Mart investigated the allegations in accordance with its policies. The investigation was led by Corporate Fraud Examiner Jennifer Webster ("Webster"). The investigation involved interviews with approximately twenty-one store associates and examination of written statements and store documents. The investigation

substantiated several allegations of serious misconduct by Cooper, including misappropriation of company funds, harassment of and inappropriate conduct regarding subordinates, and conflict of interest arising from an improper relationship with a subordinate female associate. Among other things, the investigation showed that Cooper had made sexually suggestive comments during store meetings, offered to remove a disciplinary action from the record of an associate who agreed not to report his fraternization with a female associate, verbally threatened and intimidated employees who filed reports regarding his misconduct, ordered the demotion of an associate without following Wal-Mart procedures, used Wal-Mart funds to purchase company gift cards that he then gave out in return for personal favors by female associates, and maintained an inappropriate relationship with and directed favoritism towards a female department manager.

9. Webster reported the findings of the investigation to Michael Moore, Senior Vice President, Operations West of Wal-Mart, who decided to terminate Cooper for gross misconduct. Cooper's employment was terminated on October 12, 2005 by Wal-Mart District Manager Pedro Andrade.

10. Cooper sued Wal-Mart in this Court (the "Wal-Mart Action," Civ. No. 06-468 JP/RLP), claiming race and age discrimination under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2000e-17 (2006), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 621-634 (2006). Cooper also alleged that Wal-Mart terminated his employment in retaliation for protected activity under the ADEA, specifically for a complaint of discrimination he made in 2003, as prohibited by 29 U.S.C. 623(d).

11. This Court granted summary judgment in Wal-Mart's favor on the foregoing claims by Order entered October 9, 2007 (2007 U.S. Dist. LEXIS 114026). The U.S. Court of Appeals for the Tenth Circuit affirmed on October 16, 2008 (No. 07-2290, 296 Fed. Appx. 686).

12. Following his termination by Wal-Mart, in or about May, 2008 Cooper gained employment with Kmart Corporation ("Kmart") in its Albuquerque, New Mexico store. Upon information and belief, Cooper concealed his termination by Wal-Mart and the Wal-Mart Action from Kmart in order to induce Kmart to hire him.

13. On April 5, 2010, Cooper filed a petition in bankruptcy under Chapter 13 of the Bankruptcy Code with the U.S. Bankruptcy Court for the District of New Mexico ("Bankruptcy Court"), Case No. 10-11697-SA ("Bankruptcy One").

14. On April 7, 2010, two days after filing his Chapter 13 petition, Cooper filed a Charge of Discrimination against Kmart with the New Mexico Human Rights Bureau, in which he stated, under penalty of perjury, that he believed Kmart had discriminated against him on the basis of age and race in violation of the New Mexico Human Rights Act, Title VII, and the ADEA.

15. Schedules of Assets and Liabilities filed by Cooper in Bankruptcy One on or about April 5, 2010 and signed by him under penalty of perjury (the "Bankruptcy One Schedules") stated, among other things, that Cooper was indebted to the United States and the State of New Mexico for $75,000 in income taxes.

16. Cooper was also required to disclose in his Bankruptcy One Schedules any contingent, unliquidated claims of any nature held by him. In violation of this requirement,

4

and with the intention of deceiving the Bankruptcy Court, the Standing Chapter 13 Trustee and his creditors, Cooper made no disclosure of his discrimination claims against Kmart, either in his original Bankruptcy One Schedules or in an amendment to those Schedules.

17. On April 20, 2010, the New Mexico Department of Taxation and Revenue objected to Cooper's Chapter 13 plan in Bankruptcy One on the ground that he had filed no New Mexico personal tax returns for the years 2004 through 2009 and had failed to file quarterly reports for the businesses he claimed to own. On May 7, 2010, the Standing Chapter 13 Trustee objected to Cooper's Chapter 13 plan on the grounds, among others, that he had failed to make payments pursuant to the plan and had filed a false statement regarding his marital status.

18. On June 2, 2010, the Bankruptcy Court ordered Cooper to deliver all unfiled tax returns to counsel for the Internal Revenue Service and the New Mexico Department of Labor and/or Taxation and Revenue Department no later than June 30, 2010. Cooper failed to comply with that Order, and the Bankruptcy Court dismissed Bankruptcy One by Order entered July 26, 2010.

19. Cooper moved to set aside the July 26, 2010 dismissal. On September 10, 2010, the Bankruptcy Court entered an Order providing the dismissal would be set aside if Cooper satisfied certain conditions, including that he become current on his Chapter 13 plan payments through September 2010 by October 1, 2010, and that he file his 2004, 2005, 2006, and 2008 New Mexico Personal Income Tax returns, as well as his various Gross Receipts, Compensating Use and Employee Withholding (CRS) reports, by 5:00 pm on October 1, 2010.

20. Cooper failed to comply with those conditions, and the Standing Chapter 13 Trustee gave notice of his non-compliance on October 5, 2010. On November 16, 2010, the Standing Chapter 13 Trustee filed an Interim Report showing that Cooper had made no payments to his creditors.

21. On or about October 21, 2010, Kmart terminated Cooper's employment.

22. On November 4, 2010, Cooper filed a second petition under Chapter 13 of the Bankruptcy Code with the Bankruptcy Court, Case No. 10-15575-SA ("Bankruptcy Two"). Schedules of Assets and Liabilities filed by Cooper in Bankruptcy Two and signed by him under penalty of perjury (the "Bankruptcy Two Schedules") stated, among other things, that Cooper's debt had increased by approximately $52,000 since the filing of Bankruptcy One, and that he was indebted to the United States for income taxes in the amount of $127,479. As with Bankruptcy One, Cooper, intending to mislead the Bankruptcy Court, the Standing Chapter 13 Trustee and his creditors, made no disclosure of his claims against Kmart in his Bankruptcy Two Schedules.

23. On December 1, 2010, the New Mexico Department of Taxation and Revenue objected to Cooper's Chapter 13 plan in Bankruptcy Two on the ground that it failed to provide for payment of $20,661.48 in tax liens held by the Department against real properties located in Bernalillo and Grant Counties, New Mexico. That same day (December 1) the Standing Chapter 13 Trustee moved to dismiss Bankruptcy Two for Cooper's failure to appear at his Section 341 meeting of creditors.

24. By Notice filed January 10, 2011, Cooper converted Bankruptcy Two to a liquidation case under Chapter 7 of the Bankruptcy Code, stating that he was not able to

comply with his Chapter 13 plan.

25. On February 7, 2011, Cooper's Chapter 7 Trustee reported that no non-exempt property was available for distribution to Cooper's creditors.

26. Following his April 7, 2010 Charge of Discrimination against Kmart and his October 21, 2010 termination by Kmart, Cooper sued Kmart in the District Court for the First Judicial District, State of New Mexico on January 8, 2011, asserting claims for race discrimination, age discrimination, and retaliation under the New Mexico Human Rights Act, NMSA 28-1-1, et seq. (the "Kmart Action"). Invoking this Court's diversity jurisdiction, Kmart removed the Action on January 11, 2012 (Case 1:12-cv-00034-RHS-KBM).

27. This Court dismissed Cooper's race discrimination claim in the Kmart Action by Order entered April 3, 2012.

28. On September 27, 2012, Kmart, having discovered Bankruptcy One and Bankruptcy Two and Cooper's failure to disclose his claims against Kmart in those Bankruptcies, moved to dismiss the Kmart action based on the doctrine of judicial estoppel, citing, *inter alia*, *Eastman v. Union Pac. Railroad Co.*, 493 F.3d 1151 (10th Cir. 2007).

29. On October 12, 2012, Cooper stipulated that this Court could grant Kmart's motion to dismiss. This Court dismissed the Kmart action with prejudice by Order entered October 19, 2012.

30. Gallup's HR Director position became vacant in July, 2020. Following assessment of the position and whether to engage in recruitment efforts, Gallup began looking for a replacement HR Director in 2021, continuing its search into 2022. When those efforts proved unsatisfactory, Gallup began to consider retention of an executive search

7

firm, undertaking a review of eligible firms.

31.     The position of HR Director involves and concerns matters of trust, confidence and discretion concerning sensitive personnel and employment issues, including earnings, retirement, health and family matters, and other personal concerns of a sensitive and confidential nature, affecting all segments of Gallup's staff. An HR Director must be a person in whom the City and its personnel can repose unqualified trust and confidence, including because he or she is strictly truthful and forthcoming.

32.     Since at least 2018, RHS has advertised and promoted itself nationwide as "a consortium of seasoned senior level consultants" who bring [RHS's] clients "decades of previous experience as practitioners in local, state, and federal government as well as institutions of higher education and municipal leagues," having served "as city/county managers, state league directors, federal legislative development officers, upper-level strategic planners, human resources directors, government legal counselors, and finance directors." Claiming a "level of expertise . . . unmatched by other consulting firms," RHS had an office and physical presence in New Mexico until at least 2021, and at all times relevant to its dealings with Gallup claimed to have "professional connections throughout" New Mexico, having conducted "an average of 12 – 15 [executive] searches per year." Shortly before its retention by Gallup, RHS conducted a City Manager search for Espanola, New Mexico. In 2016, RHS conducted a similar search for Las Cruces, New Mexico. RHS and its predecessor have conducted over 20 executive searches for cities, towns, and counties in New Mexico.

33.     Responding to RHS's advertising and solicitations, Gallup contacted RHS in

late 2022. RHS responded in early 2023. The response, directed to Gallup at its municipal offices, replicated representations and assurances set forth above, together with additional assurances regarding RHS's expertise and capacities, including that RHS and its personnel provided executive search services "nationwide," "underst[ood] New Mexico" and had many clients "with characteristics similar to [Gallup]," "[had] never defaulted on a contract," and were supported by a "consortium of consultants that have assisted communities across the country with over 2000 [sic] executive-level searches."

34. Accompanying the foregoing representations and assurances, RHS's response offered Gallup a Professional Services Agreement (PSA) under which RHS promised and agreed, among other things, to:

A. prepare "a recruitment brochure designed to attract highly qualified applicants" for the position of HR Director;

B. use the brochure in conducting a national search, but "demonstrat[ing] sensitivity to candidates that have local and regional qualifications;"

C. work with Gallup to determine "advertising options . . . most likely to produce quality applicants," and also "make direct contact with persons in local government management and leadership positions listed in Mercer's database . . . [including] potential candidates serving as Town/City/County Managers, Assistant and Deputy Managers, and other upper-level local government professionals;"

D. review all resumes and applications to separate those "not meeting the minimum requirements;"

E. conduct "an initial screening of the most promising candidates through

telephone/video interviews and preliminary reference checks to assess their educational background, technical knowledge, experience level, management style, and personality traits;"

F. "select a short list of 4-5 candidates that appear to be the most qualified and most closely match the position profile criteria;"

G. conduct "extensive background checks" on semi-finalist candidates, who would be interviewed "assuming they successfully complete the Mercer background checks," and then "conduct a more intensive background check of candidates identified as qualified (i.e., semi-finalists) by [Gallup] to verify the accuracy of information related to academic credentials, past employment, financial stability, criminal history, and driving record;"

H. contact "[a]dditional references . . . to better assess each candidate's work experiences;"

I. conduct "a social media/internet review . . . to ensure no candidate background 'surprises' surface later;" and

J. assist in arranging interviews and "provide recommended questions to be used in the interview process."

35.     Gallup accepted the PSA as offered by RHS on January 19, 2023.  In addition to the foregoing, under the PSA RHS agreed "to defend, indemnify and hold harmless [Gallup] from and against any and all claims, losses, liabilities or expenses which may arise due to Mercer's negligent performance of the services to be provided by this Agreement or Mercer's breach of its responsibilities under this Agreement."

36. Virtually all services provided by RHS pursuant to the PSA were provided in and directed to the State of New Mexico, including through communications to and from New Mexico and meetings occurring in New Mexico.

37. In late March, 2023 and again on May 21, 2023, Cooper submitted applications for the position of HR Director to Gallup and RHS. Among other things, the applications contained a resume of seven pages (single spaced) purporting to list and describe Cooper's education, background, credentials and employment history in minute detail. As to his employment with Wal-Mart, Cooper represented that:

A. the employment began in 1995 and that he had been approved as a Wal-Mart District Manager;

B. he "mentored and coached 24 subordinate management professionals," and "revamped training and hiring procedures;"

C. he had "applied advanced skills in budget controls and cost-avoidance measures" and had been "recognized several times by executive management team for increased store profit;" and

D. he had developed and mentored "over 75 individuals into effective management roles."

Each of the foregoing representations was false and/or misleading. Cooper's Wal-Mart employment began in 1998, not 1995. Cooper was not approved as a Wal-Mart District Manager, and in fact had been passed over for that position. Cooper's "mentoring" and "coaching" of subordinates included sexually suggestive comments during store meetings, an offer to remove a disciplinary action from the record of an associate who agreed not to

11

report his fraternization with a female associate, threats and intimidation of employees who filed reports regarding his misconduct, and his demotion of an associate without following Wal-Mart procedures. Cooper's "advanced skills in budget controls and cost avoidance measures" included the use of Wal-Mart funds to purchase company gift cards that he then gave out in return for personal favors from female associates. Cooper's mentoring of individuals "into effective management roles" included an inappropriate relationship with and directed favoritism towards a female department manager.

38. Cooper further represented that he had received awards from Wal-Mart, making no mention of the fact that his employment with the company had been terminated for gross misconduct.

39. Cooper's false representations respecting his Wal-Mart employment were repeated in his interview by RHS following his May 21, 2023 application. For example, during the interview Cooper again falsely represented that he had worked for Wal-Mart for 11 years and had been approved as a District Manager. When asked whether he had ever been terminated or asked to resign from a position, Cooper related an incident involving his 2022 employment with Navajo Housing Authority, claiming he had resigned for ethical reasons. Cooper falsely omitted his termination from Wal-Mart and the ensuing litigation comprising the Wal-Mart Action. When asked whether a thorough internet/social media check regarding Cooper would reveal anything that might embarrass or cause concern for a future employer, Cooper answered "no." When asked whether a thorough background check would reveal anything that might be of concern to a potential employer, or that he wished to disclose and explain, Cooper again answered in the negative.

40. Cooper continued his false representation and concealment in his July 12, 2023 interview with Gallup personnel, failing to correct or disclose the falsities and misleading statements made in his resume and his RHS interview when questioned regarding his employment history, his recruitment and retention practices, his experience in handling employee relations issues, and similar matters.

41. As in the case of his Wal-Mart employment, Cooper misrepresented his Kmart employment in his employment applications and related information submitted to Gallup. Such misrepresentations were made in his resume, in his RHS interview, and in his July 12, 2023 interview with Gallup employees, in and during which he claimed to have 'grown and lead' the Kmart Albuquerque store, but concealed his involuntary termination and falsely omitted that termination when directly queried. Cooper further misled Gallup by concealing the litigation comprising the Kmart Action, including the facts attending that litigation respecting the frauds he had perpetrated through false statements made under oath to the Bankruptcy Court, the Standing Chapter 13 Trustee, and his creditors.

42. Cooper actively misled Gallup in his applications and related information by failing to disclose Bankruptcy One and Bankruptcy Two and material facts related to those proceedings, including his failure to pay federal and state income taxes, his failure to file federal and state tax returns, his failure perform in accordance with Chapter 13 plans he proposed, and his failure to make any payment to his creditors.

43. Notwithstanding its representations and assurances regarding its experience, expertise, capabilities and diligence, and its contractual undertakings, RHS failed to detect any of the foregoing facts or deceptions concerning Cooper's Wal-Mart employment, his

13

Kmart employment, the Wal-Mart and K-Mart Actions, Bankruptcy One and Bankruptcy Two. Instead, RHS reported to Gallup that it found "no issues of a personal or professional nature that would prevent [Cooper] from performing the duties Human Resource Director for The City of Gallup." RHS "recommended [Cooper] for interview and further consideration by the City."

44. On June 22, 2023, RHS provided Gallup with a social media/internet report concerning Cooper, claiming to have reviewed postings and records available on Google, LinkedIn, Facebook, Twitter and Instagram. The report stated that nothing of a questionable nature had been located.

45. Following the July 12, 2023 interview, Gallup informed RHS that concerns had arisen regarding Cooper's employment, given the short term nature of his more recent positions. RHS responded, again affirming that no derogatory information could be found.

46. On July 14, 2023, Gallup offered Cooper the position of HR Director with a start date of July 31, 2023. Gallup would not have considered Cooper for the position of HR Director, and would not have made that offer or any other offer, had it been informed of the facts, misrepresentations, omissions and concealments respecting his Wal-Mart employment, his Kmart employment, and his Bankruptcies detailed above.

47. Following the commencement of his employment as HR Director, Cooper began to exhibit conduct similar to his conduct at Wal-Mart, including inappropriate comments and behavior directed to female members of the City's staff and demeaning conduct in staff and group meetings. Concerned by this conduct, Gallup personnel undertook an investigation, discovering the Wal-Mart Action and the facts revealed in that

Action through a simple Google search. When confronted with this information on or about October 24, 2023, RHS acknowledged that it had failed to detect the Wal-Mart Action and related facts, and that it would not have presented Cooper as a candidate for the position of HR Director had it known of the Action and facts.

48. In light of Cooper's misrepresentations and concealments, the facts disclosed by the Wal-Mart Action, Cooper's behavior with Gallup staff, and other circumstances, Gallup concluded that it had no practicable option but to terminate Cooper's employment, and did so on October 30, 2023.

49. Gallup has demanded that RHS honor its obligations under the PSA, including its obligation to indemnify and defend noted above. Mercer has refused that demand.

**First Claim for Relief**
**(Breach of Contract)**

50. All allegations set forth in Paragraphs 1 through and including 49 are incorporated as if fully reasserted.

51. Gallup fully performed in accordance with its contract with RHS, including by paying RHS all fees and compensation due under the contract.

52. RHS breached its contract with Gallup by, among other things, failing to perform an adequate background check of Cooper, failing to properly interview Cooper, failing to detect material, adverse circumstances concerning Cooper's background and employment history, including his employments by Wal-Mart and Kmart and facts relating to those employments and his Bankruptcies and facts relating to those Bankruptcies, and recommending Cooper for consideration as Gallup's HR Director. RHS has and continues

15

to breach its contract by and failing to indemnify and defend Gallup.

53. RHS's contract breaches have caused Gallup damage, loss and injury in amounts to be proved at trial, but believed and anticipated to exceed $75,000.

## Second Claim for Relief
## (Promissory Estoppel)

54. All allegations set forth in Paragraphs 1 through and including 53 are incorporated as if fully reasserted.

55. RHS made multiple promises to Gallup concerning its services and work, including that would conduct competent and thorough screening of applicants for the HR Director position, that it would competently and thoroughly assess applicants' backgrounds, work experience and personality traits, that it would select only the most qualified applicants for interview and would extensively check the backgrounds of those applicants, and would conduct social media/internet reviews to ensure against subsequent revelations.

56. Gallup relied on those promises and it was reasonable for Gallup to do so.

57. The promises caused Gallup to refrain and forbear from doing background checking of its own and caused Gallup to view the candidates selected by RHS as reliable and entirely qualified to hold the position of HR Director.

58. Gallup's reliance and change of position and was substantial and materially detrimental to Gallup.

59. RHS knew or should have known that Gallup would rely and change its position based upon and after RHS made its promises.

60. Gallup's reliance and change of position has resulted in damage, loss and injury in amounts to be proved at trial, but believed and anticipated to exceed $75,000, and

16

otherwise requires that RHS's promises be enforced.

### Third Claim for Relief
### (Negligence and Negligent Misrepresentation)

61. All allegations set forth in Paragraphs 1 through and including 60 are incorporated as if fully reasserted.

62. RHS made material misrepresentations of fact concerning its competence, capabilities and practices, intending that Gallup rely on those misrepresentations.

63. RHS had no reasonable ground for believing the misrepresentations were true. RHS lacked the competence and capacities it claimed. Alternatively, it undertook a duty of competence, care and diligence owed to Gallup, and failed to comply with that duty in this case.

64. Gallup relied on the misrepresentations in entering into the PSA with RHS, in accepting and acting on information provided by RHS concerning Cooper, in considering Cooper for the position of HR Director, and in offering Cooper the position of HR Director.

65. Gallup's reliance and/or RHS's negligence have resulted in damage, loss and injury to Gallup in amounts to be proved at trial, but believed and anticipated to exceed $75,000.

WHEREFORE, the City of Gallup respectfully requests that the Court enter judgment in its favor and against Third-Party Defendant Reaching Higher Solutions, LLC, a/k/a Reaching Higher HR Solutions, LLC, d/b/a Mercer Group Associates for its damages, losses and injuries in amounts to be proved at trial, but believed and anticipated to exceed $75,000, together with pre and post judgment interest thereon, for its costs and

expenses of suit, including its reasonable attorneys' fees, and for such other and further relief as the Court finds just and appropriate.

        MASON & ISAACSON, P.A.

        By<u>/s/ *Thomas Lynn Isaacson*</u>
        Thomas Lynn Isaacson
        P.O. Box 1772
        104 E. Aztec Dr.
        Gallup, New Mexico 87301
        (505)722-4463
        (505)722-2629(fax)
        tli@milawfirm.net

        and

        Gallup City Attorney
        David Eason
        110 W. Aztec
        Gallup, NM 87301
        (505) 863-1272
        dreason@gallupnm.gov
        *Attorneys for Defendant/Counter-Claimant and Third-Party Plaintiff City of Gallup*

## CERTIFICATE OF SERVICE

I CERTIFY that the foregoing pleading was filed through the CM/ECF system on the 28th day of July, 2025 and that the following individuals were served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kenneth Cooper
kecoopersr@aol.com

Wendy A. McMillon
Wendy.mcmillon@qpwblaw.com


/s/ Thomas Lynn Isaacson